# N. Y. SUPREME COURT.

ENOCH MORGAN'S SONS' COMPANY agt. BENJAMIN F. TROXELL
and others.

*Trade-mark — when injunction will be granted — When proven that the public
have been deceived — what damages will be given.*

The plaintiffs were the manufacturers and vendors of a new article of soap,
put up in the form of a pressed cake, wrapped in silver-foil paper,
encircled with an ultramarine blue colored paper band, printed in gold
letters. The defendants manufactured a similar article, and introduced
it to the market in an original envelope. It did not sell, and they there-
fore enveloped their soap in a wrapping substantially the same as the
plaintiffs, though having minute variations. *Held:*

(1.) That an injunction will be granted, where the differences between
the trade-mark and an infringement can be detected upon a brief though
careful comparison, if it be apparent that the object in putting up the
infringing article was simply to gain custom by a general resemblance to
the genuine article.

(2.) That, where it is proven that the public, asking for the genuine
article, in buying from retail grocers, are supplied with an article in the
simulated wrapping, and take it without detecting the simulation, it is
sufficiently proven that the public have been fraudulently deceived.

(3.) That damages will be given only for such sales as have taken place
after the commencement of the action, where it is shown that the plain-
tiffs knew of the infringement, but took no steps to arrest it.

*Special Term, February,* 1879.

THIS was an action for the infringement of a trade-mark of
"Sapolio," in the dress, or manner of putting up the same
for sale. It was referred to a referee, with power to hear and
determine.

*Clarence A. Seward* and *John Henry Hull,* for plaintiffs.

*E. More,* for defendants.

J. S. BOSWORTH, *Referee.* — There are firmly settled rules
of law applicable to trade-marks and the infringement thereof.
The difficulty which is encountered in new cases lies in the

application of these rules to the facts presented for the consideration of the court.

Judge ALLEN, in his opinion in *Popham* agt. *Cole* (66 *N. Y.*, 74), said : " The imitation of a trade-mark, with a design to deceive the public, and which is liable to deceive them, and enable the imitator to pass off his goods as those of him whose trade-mark is imitated, is a fraud upon the latter, and a false representation to the public, and the injured party may have relief to the extent that the imitation is deceptive and liable to mislead.   *     *     *   The question in this, as in every other case, is whether there is such resemblance between the two as to deceive a person using ordinary caution."

The same learned judge, in his opinion in *Coleman* agt. *Crumb* (70 *N. Y.*, 578), said : " It is an infraction of that right to print or manufacture or put on the market for sale and sell for use upon articles of merchandise of the same kind as those upon which it is used by the proprietor, any device or symbol, which, by its resemblance to the used trade-mark, will be liable to deceive the public and lead to the purchase and use of that which is not the manufacture of the proprietor, believing it to be his.   It is not necessary that the symbol, figure or device used or printed and sold for use, should be a *fac simile*, a precise copy of the original trade-mark, or so close an imitation that the two cannot be distinguished except by an expert, or upon a critical examination by one familiar with the genuine trade-mark.   If the false is only colorably different from the true, if the resemblance is such as to deceive a purchaser of ordinary caution, or if it is calculated to deceive the careless and unwary, and thus to injure the sale of the goods of the proprietor of the trade-mark, the injured party is entitled to relief."

In *Goldman* agt. *Hunt* (122 *Mass.*, 148) the court said : "All the authorities agree that the court will not restrain a defendant from the use of a label on the ground that it infringes the plaintiff's trade-mark, unless the form of the

printed words and the words themselves and the figures, lines and devices are so similar that any person, with such reasonable care and observation as the public generally are capable of using and may be expected to exercise, would mistake one for the other."

Whether there is such a resemblance between the two as to deceive a purchaser using ordinary caution, or whether that resemblance is such as is calculated to deceive the careless and unwary, or whether the "figures and lines and devices are so similar that any person, with reasonable care and observation, such as people are capable of using and as people are expected to exercise, would mistake one for the other," would seem to be answered satisfactorily by clear proof that a person, desiring to obtain "Sapolio," mistook for it articles manufactured by the defendants, and bought and paid for the latter, believing that they were furnished with the former.

In *Woolam* agt. *Ratcliff* (1 *H. & M.*, 259) the plaintiff put up bundles of silk, manufactured by him, in a particular form, which the case describes, and he used to place under the center string a label containing the following mark : " St. A ***** " which represented " St. Albans," where the plaintiffs manufactory was and which was well known in the trade as the plaintiff's trade-mark. The defendant, in that suit, made up a quantity of silk in bundles, in exact imitation of the plaintiff's bundles, and affixed a label exactly like that of the plaintiff, except that the mark " St. A ***** " was omitted. The chancellor, Sir W. Page Wood, in his opinion, said : " Then it is said that the plaintiff has a very striking mark, by which any one could be satisfied whether any particular goods were supplied by the plaintiff or not, and we have not attempted to imitate that mark, and this would be no answer. If I had any proved instance in which goods supplied by the defendant had been actually sold as goods of the plaintiff, a case which might very well happen, at least, in a foreign market." &c., &c. The vice-chancellor deemed it established that in the English market " St. A ***** " would have been necessary

and sufficient as the *indicia* of the plaintiff's goods, and he did not think that in their absence the goods could have been sold in England as the plaintiff's manufacture, notwithstanding the circumstances of suspicion. He concluded by saying: " Still, I have no evidence that any one has, in fact, been deceived. I do not think myself justified in holding that such has been the case."

The leading facts established by the evidence in this case, are, in brief, as follows :

The firm of Enoch Morgan's Sons was engaged in business in 1861. The survivors of that firm made an assignment of its business to the plaintiffs in 1869. Enoch Morgan's Sons, the plaintiffs' predecessors, manufactured a compound for cleaning and scouring, commonly called, " scouring soap," to which they gave the name of " Sapolio." It was in the form of a pressed and stamped cake, inclosed in a tin-foil paper wrapper, encircled by an ultramarine blue and gold band, and packed in a box containing half a gross. On this band were printed, in gold letters, the words, "sapolio, for cleaning and scouring ; " and there was upon the band, also, a human face reflected by a polished pan. This band went around the cake lengthwise.

This was the first scouring soap put up in this form or style, or to which this name was given, or to which this device was affixed. In their advertisements they state, in substance, the style in which Sapolio was put up.

In 1872, William S. Troxell, now deceased, manufactured a scouring soap which he called " the Pride of the Kitchen." At that time it was made in the form of a thick paste, and was put up in tin boxes. The result of this manufacture being unsatisfactory, Troxell had a conversation with one Wood, who was then in his employ, in respect to getting up something different. Troxell bought a cake of " Sapolio," took it to his office and kept it there, and finally came to the conclusion that to ordinary observation, both on its face, and

in its appearance, a sample cake which Wood made was the same as " Sapolio."

Wood procured one Bliven to engage with Troxell in the manufacture of this scouring soap. Bliven testified that, after Troxell had come to terms with him, he had conversations with him as to the manner of putting up the soap. Troxell wished to make two kinds — one like the " Sapolio" manufactured by Enoch Morgan's Sons, and another which he called " toilet soap."

They commenced to manufacture mineral soap and made several tons of it in the form of bars, which Troxell attempted to put upon the market. After a few days, he said to Bliven, " I think it best to put it up in cakes as I find objection among the dealers to buy it in bars; I think we better put it up as near the style of Sapolio as possible." He then asked Bliven if he would have the die procured, and Bliven told him that he would not do so as he thought it would be an infringement on the soap already in the market; Troxell said that he would take the responsibility. Bliven thereupon had the die made, and manufactured several hundred weight of soap, and put it up tightly pressed with the die.

In the spring of 1873, the conclusion was reached to make the soap in the form of pressed cakes and the question of wrapping them then came up — what should be the style of the wrapper? Bliven said, " I told Troxell I did not see the utility of putting a binding around it; he suggested a red and blue band, but he wanted to get a soap which he could put on the shelf beside ' Sapolio,' so that persons could not see the difference between the two. Troxell, in all his conversations, seemed to desire to imitate, as closely as possible, ' Sapolio,' without making himself absolutely liable. He used that language."

Wood testified, substantially, that Troxell said that he wanted to get up a trade-mark similar to the face looking into a pan, and, during the time Wood was with him, produced several sketches of a monkey looking at his reflected image

in a pan. Troxell finally concluded that his device was as near as he could get it, and it was subsequently placed upon the defendants' manufacture.

The plaintiff has proved that in some thirty different stores kept by retail grocers, when the article "Sapolio" was asked for, "Pride of the Kitchen" was delivered to the customer without any explanation. In several of these stores repeated occurrences of this character have been proved. Many of these witnesses were housekeepers, who had used "Sapolio" for years, and did not know there was such an article as "Pride of the Kitchen" in the market, although they had used it so long. The only things in their recollection and impression as to the exterior appearance of it were the size and the form of the cake, and its being in a foil wrapper surrounded by a band of ultramarine blue. They did not have in mind whether the blue band went around lengthwise, or around its sides. When "Pride of the Kitchen" was delivered to them in reply to a request for "Sapolio," they did not discover the deception until they began to use the article, when they discovered, on taking off the wrapper of the cake, that it crumbled, which they had never known "Sapolio" to do, also, that it scratched articles which they tried to clean and polish with it.

Grocers were induced to do this because they made more money on "Pride of the Kitchen" than on "Sapolio."

The defendant Parshall purchased a half interest in "Pride of the Kitchen," and became partner with Troxell about July 1st, 1874, under the firm name of W. L. Troxell & Co. Parshall at this time was interested in the profits of the firm of H. K. & F. B. Thurber, and bought and held their half interest. They paid for this half interest. They were capitalists in business, making sales of "Pride of the Kitchen" to grocers who retailed it. Afterwards W. L. Troxell died, and B. F. Troxell, the present defendant, as his administrator, sold the business out to Parshall, and then bought a half part in his own name. When Parshall became a partner, the defend-

ants' article was put up with bands of three or four different colors, orange, red, blue and green. The defendants afterwards discontinued entirely the use of all colors, except red and blue, and in 1876 they discontinued the use of the red band, and from that time have continued to use the blue band alone. The reason they assign for this is that they had used up the red paper, and were informed by grocers that it faded more than the blue; that it was more trouble to put up soap in that color than in bands of the first color; but the defendants conceded that it was no more trouble to put the first colored band around their soap than the one which they have latterly used, and I think it clear on the evidence that paper for the band of permanent red color could be obtained for substantially the same price as blue paper, and it is evident that, with a red band, the manufacture of the defendants would much less resemble "Sapolio."

A careful, though brief, inspection and comparison of the two styles of soap would disclose differences to the eye in the two articles.

On the "Sapolio" the blue bands go around the cake lengthwise. On "Pride of the Kitchen" the blue band is wider, and goes around the sides of the cake. On the latter are printed the words "Troxell's Pride of the Kitchen — Trademark — Soap for scouring and polishing." Between the word "trade" and the word "mark" is the device of a monkey with his head reflected in a pan. On the blue band, which goes around the cake of "Sapolio," are printed the words "For cleaning and polishing — Manufactured by Enoch Morgan's Sons' Company, 440 West street." There is also on it a device of the human face reflected in a pan.

It is very obvious, therefore, that any person who can read, on carefully comparing the two, not only could but would detect differences between the imprints upon the labels; and, if they could not read, they would discover differences in the width of the blue band, and that one went around the length of it, and the other around the sides of it, yet it may be true

that as Sapolio has become well known in the market, and is regarded with favor, that the defendants might believe that their "Pride of the Kitchen" had such a general resemblance to "Sapolio," both in respect to the size of the cake and as to its dress, that any grocers who kept "Sapolio" could place it by "Pride of the Kitchen" and deliver it to persons applying for "Sapolio," such persons would not discover the difference, and would take it supposing that they were receiving "Sapolio."

It is established by the evidence that persons who bought of grocers, although they called for "Sapolio," and wanted it, on having "Pride of the Kitchen" handed to them in answer to their application did not discover the difference, but took "Pride of the Kitchen," believing that it was "Sapolio."

The evidence tends strongly to the conclusion that "Pride of the Kitchen" was put up as it is put up, after it was produced in the form of a pressed cake, with a view to make it resemble "Sapolio," with the intent that it might be, and in the expectation that it would be, delivered by retail grocers for "Sapolio," and in the belief that, as to its general resemblance, such purchasers would not discern the differences between the two, and would take one for the other. An effect has been given to this intent. The defendants have realized their expectations. There was an intent on the part of the defendants to mislead the public, and the public has been misled, and the plaintiffs have been subjected to loss and damage thereby. Fraud and damage are thus coupled together as cause and effect.

The defendants object to the plaintiffs' right to any damages, on the ground that, knowing of the defendants putting up "Pride of the Kitchen," they have not complained or objected to it otherwise than by bringing this action. That, of course, cannot excuse the defendants from putting up subsequently thereto any cakes of "Pride of the Kitchen," calculated to mislead the purchaser, and in fact misleading them. Enoch Morgan's Sons did not anticipate

Enoch Morgan's Sons' Company agt. Troxell.

any result adverse to their business from any attempt to introduce "Pride of the Kitchen," so long as it was put up with bands of various colors, and was attempted to be sold on its merits. The defendants discontinued the red band in October, 1875, but this fact did not become known until in the winter of 1876 to the present plaintiffs. They did not have any information until the winter of 1876–7, which led them to suspect that any such deception was used to make sales of the "Pride of the Kitchen." On being satisfied by proof that it was so used, they pushed their inquiries, and, when they had collected such evidence as they supposed would enable them to establish an intent on the part of the defendants to mislead the public, and that the public had been misled, they commenced this suit, and about the same time commenced another action against the manufacturers of a soap called "Saphia," and notified others who had put up scouring soap in imitation of "Sapolio." All abandoned voluntarily, except those who were enjoined, and these defendants. Nevertheless, Enoch Morgan's Sons could have notified the defendants, on discovering what they had done and were doing, that the plaintiffs objected to an infringement of their rights. For all practical purposes, I think the plaintiffs must be presumed to have known, at and from the time of their purchase, what persons comprising the firm of Enoch Morgan's Sons' Company knew in this regard ; and, under the circumstances, though with some hesitation, I conclude that the defendants should not be required to account for sales made prior to the commencement of this action. An objection to this conclusion arises from the fact that prior sales are found, upon the evidence, to have been effected by a designed attempt to mislead the public, which was successful, and, since the commencement of this suit, the defendants have omitted from the blue bands placed around the cake put up the design of the monkey looking at and reflected from the pan. In their testimony it is alleged that they abandoned this device, because they considered it did not amount to anything, and

did not believe it had been. the means of selling a cake of soap; yet it is declared, in words printed on their blue band, to be their " trade-mark."

If the conclusions on this subject are correct, it justifies the opinion that " Sapolio," in the recollection and impression of purchasers, was regarded as a cake of soap of certain form and size, and inclosed in a silver-foil paper wrapper, sur-rounded by an ultramarine blue band, and that, in ignorance of there being other soap put up in like form and appear-ance, they would take, from the grocers giving them "Pride of the Kitchen," in answer to a call for " Sapolio," the article handed to them, without discovering that they had not received what they asked for and wished to purchase.

It is also possible that not only careless and unwary pur-chasers but purchasers of ordinary caution, using such care as such purchasers ordinarily exercise, may have been deceived and received from grocers " Pride of the Kitchen," having on it a band of orange red instead of " Sapolio," believing that they were receiving the latter.

The evidence tends to show that some purchasers were in fact misled ; but I give the defendants the benefit of all doubts on this question, and charge them with only those sales proved to have been made of soaps made by them since the suit was brought, and actually sold.

The amount thus sold appears to have been 1,901 boxes, and I compute and allow the damages thereon at $4,752.58, for which the plaintiff is entitled to judgment, with relief by injunction also, to the extent that the imitation prepared by the defendants is deceptive and calculated to mislead.